729 S.E.2d 151

**CSX TRANSPORTATION, INC., a Virginia Corporation, Defendant Below, Petitioner**

v.

**Angela SMITH, Plaintiff Below, Respondent.**

No. 11–0694.

Supreme Court of Appeals of West Virginia.

Submitted April 17, 2012.

Decided June 7, 2012.

Marc E. Williams, Melissa Foster Bird, Jeremy C. Hodges, Nelson Mullins Riley & Scarborough, LLP, Huntington, WV, for Petitioner.

Mark A. Atkinson, Paul L. Frampton, Jr., Atkinson & Polak, PLLC, Charleston, WV, Harry M. Hatfield, Hatfield & Hatfield, Madison, WV, for Respondent.

PER CURIAM:

The petitioner herein and defendant below, CSX Transportation, Inc. (hereinafter "CSX"), appeals from an order entered November 19, 2011, by the Circuit Court of Boone County. By that order, the court denied CSX's motion for post-trial relief ruling that the respondent herein and plaintiff below, Angela Smith (hereinafter "Ms. Smith"), had presented sufficient evidence to prove her hostile work environment claim; the jury had been instructed correctly on the law of retaliatory discharge; and the evidence supported the jury's award of punitive damages. On appeal to this Court, CSX challenges the circuit court's post-trial rulings. Upon a review of the parties' arguments, the record designated for appellate consideration, and the pertinent authorities, we conclude that the circuit court did not err by denying CSX's request for post-trial relief. Accordingly, we affirm the November 19, 2011, order of the Boone County Circuit Court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

At the time of the events giving rise to the instant proceeding, Ms. Smith had worked

for CSX for ten years: first as a yardmaster in Danville, West Virginia, and, then, following several promotions, as a trainmaster[1] in Grafton, West Virginia. On June 28, 2007, Ms. Smith was having a telephone conversation with a coworker, trainmaster Clay Newsome (hereinafter "Mr. Newsome"), who was stationed in Clifton Forge, Virginia. During the conversation in which Mr. Newsome was talking over his telephone's hands-free speaker, Ms. Smith overheard another CSX employee, trainmaster E. Wesley Knick (hereinafter "Mr. Knick"), comment to Mr. Newsome, "So how does Angie Smith taste and feel because I heard she's never had a d* * * in her."[2] Mr. Knick and Ms. Smith had never met or spoken prior to this incident. Mr. Newsome immediately hung up his telephone, but Ms. Smith called him back to ascertain the source of the disparaging comment.

Approximately two weeks later, on July 13, 2007, Ms. Smith and Mr. Newsome scheduled a meeting with their supervisor, Assistant Division Manager Jay Fleenor (hereinafter "Mr. Fleenor"), to report Mr. Knick's June 28, 2007, comment about Ms. Smith. Additional lewd and offensive remarks that Mr. Knick had made regarding Ms. Smith and her sexual orientation also were reported during this meeting, as were Mr. Knick's derogatory comments about another female trainmaster.[3] Following this meeting, Mr. Fleenor summoned Mr. Knick to CSX's Huntington office to discuss Mr. Knick's alleged harassment of Ms. Smith. Afterwards, Mr. Knick was placed on administrative leave pending an investigation of the charges, apparently as a result of CSX's "zero-tolerance" policy regarding sexual harassment. During this time, several CSX employees reported overhearing Mr. Knick blame Ms. Smith for the loss of his trainmaster position and threaten retaliation against her. On August 16, 2007, CSX removed Mr. Knick from

his management-level trainmaster position, but it did not terminate Mr. Knick's employment. Following his demotion, Mr. Knick exercised his union seniority rights to transfer his employment to a locomotive engineer position based in northern West Virginia. As a result of his position and location transfers, Mr. Knick's new supervisor was Ms. Smith.

Also on August 16, 2007, after concluding their investigation and removing Mr. Knick from his trainmaster position, two CSX officials contacted Ms. Smith to inform her of their investigatory findings and the resultant discipline imposed upon Mr. Knick. The CSX officials told Ms. Smith that Mr. Knick had not reacted well to his demotion and that he would be transferring to the territory she supervised. Ms. Smith advised the CSX officials of her apprehension about supervising Mr. Knick's job performance and that the prospect frightened her. Due to Mr. Knick's comments alluding to violence and retaliation, and out of an apparent concern for Ms. Smith's safety, the CSX officials further instructed Ms. Smith to pack her belongings, leave her office, and not return to work. They informed Ms. Smith that she would be placed on paid administrative leave until they could "figure out where else to send" her. Ms. Smith heeded their orders, packed her belongings, and left work.

The following morning, an unidentified man pounded on the front door of Ms. Smith's home for approximately an hour, yelling "Come out b* * * *. Don't be afraid of me. Come out. You cost me my job [sic] and I'm going to get you, come on out." Ms. Smith did not call the police at the time of this incident because her telephone was located in the same room as the front door, and she was afraid to enter that part of her dwelling. Immediately after the man left, Ms. Smith packed her bags; traveled to Charleston, West Virginia; and reported the

---

1. The trainmaster position is a management-level position.

2. Ms. Smith is a lesbian.

3. At the time of these events, CSX employed two female trainmasters in its Huntington division: Ms. Smith and the other female employee referenced herein. Mr. Knick allegedly made derogatory, sexually-harassing comments about, and directly to, both women. The other female trainmaster and Mr. Newsome had met with Mr. Fleenor in early June 2007 regarding Mr. Knick's remarks to and about her, but CSX did not discipline Mr. Knick with respect to those remarks.

incident to CSX officials. CSX thereafter paid for Ms. Smith to stay in a Charleston hotel for eight days. However, CSX did not investigate this incident or question Mr. Knick about his possible involvement therein.

During her leave, Ms. Smith met with CSX officials who offered to transfer her to train-master positions in either Tennessee or Kentucky so that she would not have to supervise Mr. Knick. When Ms. Smith refused these proposed transfers, her supervisor asked her to meet with an employment counselor. The employment counselor, in turn, referred Ms. Smith to a psychiatrist who diagnosed her with adjustment disorder, anxiety, occupational harassment, clinical depression, and increased blood pressure related to her employment.[4] Ms. Smith received treatment for these diagnoses and remained off work on paid medical leave for approximately six months. During this time, Ms. Smith received harassing, almost daily, telephone calls from a man who kept calling her names and saying, "I'm not finished with you." and "Hey, b* * * *, I haven't forgotten what you've done. Watch your back. I'm going to get you." Despite changing her telephone number three times, the calls persisted. Although Ms. Smith reported these phone calls to her CSX supervisor and the railroad police, the caller could not be identified because the calls were made from a private, blocked number.

In April 2008, Ms. Smith's treating psychiatrist released her to return to work. Upon her doctor's recommendation, Ms. Smith accepted a transfer back to her former position as a yardmaster in Danville, West Virginia, so that she would not have to supervise Mr. Knick. The return to her former yardmaster position required Ms. Smith to move her residence from Grafton, West Virginia, to the Charleston area and to accept a $35,000 per year reduction in her salary. In May 2008, Ms. Smith filed a complaint in the Circuit Court of Boone County against CSX[5] alleging sexual harassment hostile work environment, constructive discharge, retaliation for her complaints of sexual harassment, and negligent retention of Mr. Knick.[6]

After she had begun working in Danville, Ms. Smith received another threatening phone call from an unidentified male caller who asked, "Hey, b* * * *, did you hear about Clay Newsome?" Ms. Smith later learned that Mr. Newsome had been attacked while working on a train on a rail line. Specifically, someone had hit Mr. Newsome on the head from behind, causing him to be hospitalized for several days with a severe concussion. Ms. Smith reported this telephone call to her supervisor and to the railroad police.

In the fall of 2008, Ms. Smith began having car trouble, which impeded her ability to travel to and from her job site in Danville. Ms. Smith also expressed fear for her own personal safety while driving an unreliable vehicle because of the threats she had received and because Mr. Newsome, who had supported her reporting of Mr. Knick's derogatory comments to CSX, had been attacked. CSX regularly uses a taxi service to transport workers, provide transportation for employees who have car trouble, and perform work-related errands. Thus, Ms. Smith asked one of her supervisors if she could use a CSX taxi to occasionally commute to and/or from work while her car was being repaired. Two other supervisors also approved Ms. Smith's use of the CSX taxi service while her car was being fixed to ensure that she arrived at work in time for her yardmaster shift and remained safe while commuting to and/or from work.[7]

---

**4.** Ms. Smith's diagnosis of increased blood pressure was particularly worrisome in light of her already compromised medical condition.

**5.** Although Ms. Smith also named as defendants certain CSX officials and Mr. Knick, during the course of the litigation she has dismissed all of the individual defendants leaving CSX as the sole adversarial party in these proceedings.

**6.** In addition to the experiences of Ms. Smith and the other referenced female trainmaster, the rec-

ord evidence indicates that a third female CSX employee also was sexually harassed by Mr. Knick. Those allegations were reported to CSX in 2001, and despite recommendations by CSX's Human Resources Department that Mr. Knick participate in a behavior modification program, CSX never disciplined Mr. Knick for, or even informed him of, such charges.

**7.** Ms. Smith testified that, as a yardmaster, she routinely ordered thirty or more taxis per shift, and one hundred to three hundred taxis per

Unbeknownst to Ms. Smith, CSX commenced an investigation in December 2008 regarding her use of the CSX taxi service. Also during this time, CSX questioned Ms. Smith about a train that ended up on the wrong track. Although the train's conductor had taken responsibility for the mistake, CSX suggested to Ms. Smith that she also was at fault for the error. During this exchange, one of Ms. Smith's supervisors alluded to CSX's desire to find a reason to terminate her employment and his opposition thereto.

The day after the track inquiry, Ms. Smith was requested to attend another meeting at which her illness-related work absences were questioned. When Ms. Smith explained she had a doctor's excuse to miss work due to a scratched cornea, CSX officials informed her that it does not accept doctor-excused absences.

The next day, Ms. Smith was questioned extensively about her taxi usage.[8] In January 2009, CSX suspended Ms. Smith without pay for improper taxi use. In March 2009, CSX terminated Ms. Smith for using CSX taxis to travel to and from work. As of the date of Ms. Smith's firing, no other CSX employee had been disciplined or dismissed for improperly using the CSX taxi service.

Upon her termination, Ms. Smith amended her complaint to state a claim for retaliatory discharge and exercised her collective bargaining agreement rights to challenge her discharge through union procedures.

A bifurcated jury trial was held in the Circuit Court of Boone County on the claims asserted by Ms. Smith against CSX. As to the liability phase of the trial, the jury returned a verdict for Ms. Smith finding that (1) Ms. Smith "was subjected to a hostile work environment"; (2) CSX did not "investigat[e] and adequately respon[d] to the misconduct alleged by [Ms.] Smith"; (3) CSX "retaliated against [Ms.] Smith as a result of her complaints of sexual harassment and/or her filing of a lawsuit against [it]"; and (4) CSX "negligently retained [Mr.] Knick as an employee and that such negligence proximately caused the damages alleged by [Ms. Smith]." Additionally, the jury awarded Ms. Smith $1,557,600 in compensatory damages.[9] With respect to punitive damages, the jury then found that CSX's "actions in this matter w[ere] malicious, oppressive, wanton, willful, reckless or with criminal indifference to civil obligations" and awarded Ms. Smith $500,000 in punitive damages.[10]

Following the circuit court's entry of judgment for Ms. Smith, CSX filed a motion for

---

week; each of the other yardmasters employed by CSX also employed approximately the same number of taxis per shift and per week. She explained that, when she used the taxi service, she usually rode a taxi that had already been requested for another employee and that happened to be traveling in her direction. Ms. Smith estimated that she called a taxi for herself, alone, only about five to ten times over a several month period and only after she first had obtained permission from her supervisors to do so.

**8.** CSX also accused Ms. Smith of improperly completing taxi request forms and falsifying other taxi request forms that had been prepared and submitted under her employee identification number *before* she had reported for work on a particular day. However, it does not appear that Ms. Smith was aware of these charges prior to her termination, nor was she questioned by CSX with regard thereto or afforded an opportunity to respond to such allegations. Ms. Smith later answered these accusations at trial by explaining that the manner in which she prepared the taxi request forms was in accordance with her training and that she had been completing the forms in this manner for ten years without incident.

With respect to the falsification charges, Ms. Smith explained that, because the CSX system was slow in giving new employees access to the computer system, new employees often had to use the employee identification number of more senior employees to complete taxi request forms, and, thus, the forms that CSX alleged that Ms. Smith had falsified actually had been prepared by a more junior employee using her identification number.

**9.** Ms. Smith's $1,557,600 compensatory damages award was comprised of $277,600 for back pay; $1,000,000 for front pay; and $280,000 for "[a]ggravation, inconvenience, indignity, embarrassment, humiliation and emotional distress."

**10.** In its August 9, 2010, judgment order, the circuit court granted Ms. Smith an additional $51,011.85 in prejudgment interest on her back pay award. Thus, the total amount of Ms. Smith's compensatory damages award is $2,108,611.80. The circuit court did not alter or amend Ms. Smith's $500,000 punitive damages award. Therefore, the resulting ratio of punitive damages to compensatory damages, exclusive of prejudgment interest, is 0.32 to 1.

post-trial relief pursuant to Rules 50 [11] and 59 [12] of the West Virginia Rules of Civil Procedure. By order entered November 19, 2011, the circuit court denied CSX's request for post-trial relief, concluding that Ms. Smith had presented sufficient evidence to prove her hostile work environment claim; the jury had been instructed correctly on the law of retaliatory discharge; and the evidence supported the jury's award of punitive damages. From this adverse ruling, CSX now appeals to this Court.

## II.

### STANDARD OF REVIEW

On appeal to this Court, CSX challenges the correctness of the circuit court's order denying its motion requesting post-trial relief in accordance with Rules 50 and 59 of the West Virginia Rules of Civil Procedure. With respect to a motion for judgment as a matter of law under Rule 50, we previously have held that "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. pt. 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009). Furthermore, when review is sought of a decision regarding a motion for a new trial made pursuant to Rule 59,

> "[t]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, in part, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

Syl. pt. 2, *Estep v. Mike Ferrell Ford Lincoln–Mercury, Inc.*, 223 W.Va. 209, 672 S.E.2d 345 (2008).

In addition to these general guidelines, more specific standards govern the precise issues raised by CSX in its appeal from the circuit court's rulings. Thus, we will consider the parties' arguments in accordance with these general guidelines and pursuant to the more specific standards of review that will be set forth in connection with our consideration of each assigned error. *See generally* Section III., *infra.*

## III.

### DISCUSSION

Before this Court, CSX raises three assignments of error: (1) the evidence was insufficient to prove Ms. Smith's claim of a hostile work environment based upon sexual harassment; (2) the circuit court erred by instructing the jury in accordance with certain of Ms. Smith's proposed jury instructions; and (3) the award and amount of punitive damages granted to Ms. Smith was improper. We will consider each of these assigned errors in turn.

### A. *Sexual Harassment Hostile Work Environment*

For its first assignment of error, CSX argues that the evidence presented at trial does not prove Ms. Smith's claim that CSX subjected her to a hostile work environment due to sexual harassment because such a claim cannot be based upon a single, isolated incident of sexual harassment, *i.e.*, Mr. Knick's comment regarding Ms. Smith. Rather, CSX contends that, to be actionable, sexual harassment that creates a hostile work environment must be "severe or pervasive" and that, absent evidence of additional sexually harassing conduct, one comment does not satisfy this threshold standard. Syl. pt. 5, in part, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995).

In denying CSX's motion for post-trial relief, the circuit court determined that Ms.

---

11. West Virginia Rule of Civil Procedure 50(b) provides, in pertinent part, that "[t]he movant may renew the request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment and may alternatively request a new trial or join a motion for a new trial under Rule 59[.]"

12. Pursuant to Rule 59(a)(1) of the West Virginia Rules of Civil Procedure, "[a] new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law[.]"

Smith had presented sufficient evidence at trial from which the jury could have found that CSX subjected her to a hostile work environment based upon sexual harassment. In this regard, the circuit court opined that the single, isolated comment by Mr. Knick was sufficiently severe so as to satisfy the severity prong of the *Hanlon* test. Nevertheless, the circuit court found further that Ms. Smith had presented additional evidence of sexual harassment to support her claim that such misconduct created a hostile work environment: Mr. Newsome reported that Mr. Knick had made other, prior comments denigrating Ms. Smith on the basis of her gender; the jury could have concluded that Mr. Knick perpetrated the door knocking episode at Ms. Smith's house and made the threatening telephone calls to her and that such conduct rose to the level of physically aggressive conduct as contemplated by W. Va.C.S.R. § 77–4–2.5 (1992); and Ms. Smith's superiors believed Mr. Knick's conduct to be so severe that they directed her to leave her workplace for her own safety after they demoted Mr. Knick for making the derogatory comment about Ms. Smith.

CSX contends that the circuit court erred by upholding the jury's finding of a hostile work environment based upon sexual harassment because the evidence upon which Ms. Smith bases her claim does not establish sexual harassment that was either severe or pervasive enough to significantly alter her working conditions. *Citing* Syl. pt. 5, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741. First, CSX contends that the conduct of which Ms. Smith complains, Mr. Knick's single, isolated comment, is not severe within the meaning of hostile workplace jurisprudence because it was precisely that: a *single, isolated* comment that did not recur. In other words, CSX suggests that "the sporadic use of abusive language"[13] and "isolated incidents ... will not amount to discriminatory changes in the terms and conditions of employment."[14] Instead, the evidence must

demonstrate that the sexually motivated conduct is "frequen[t] ... [and] ongoing"[15] or that "there has been a significant accumulation of incidents"[16] to render it actionable.

Moreover, CSX contends that the conduct of which Ms. Smith complains also was not sufficiently pervasive so as to constitute a hostile working environment. *Citing* Syl. pt. 5, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741. On this point, CSX asserts that Mr. Knick did not make the controverted comment directly to Ms. Smith, but rather he directed it to Mr. Newsome, while Ms. Smith, who was not present in Mr. Newsome's office, merely overheard it. Additionally, CSX challenges the circuit court's rulings in which it found that the jury could have attributed the anonymous house and telephone call threats to Mr. Knick because, CSX argues, the evidence did not establish the instigator's identity. Finally, CSX charges that even if the house and telephone threats could be attributed to Mr. Knick, such conduct was not actionable as indicative of a hostile workplace insofar as all of these exchanges occurred at Ms. Smith's residence or over her household phone and not in the CSX workplace.

Ms. Smith disputes CSX's characterization of the evidence and responds that the circuit court properly determined that whether her evidence proved her claim of a hostile work environment based upon sexual harassment was a question of fact to be resolved by the jury. As to the merits of this issue, Ms. Smith contends that Mr. Knick's comment was sufficiently severe so as to constitute a hostile work environment. Syl. pt. 5, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741.

Alternatively, Ms. Smith asserts that the sexual harassment she endured while she was employed by CSX was sufficiently pervasive so as to render her workplace hostile. In the course of reporting Mr. Knick's com-

**13.** *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998) (internal quotations and citation omitted).

**14.** *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283, 141 L.Ed.2d 662 (internal quotations and citation omitted).

**15.** *Conrad v. ARA Szabo,* 198 W.Va. 362, 373, 480 S.E.2d 801, 812 (1996).

**16.** *Hanlon,* 195 W.Va. at 112, 464 S.E.2d at 754.

ment to her superiors, Ms. Smith learned that Mr. Knick had made other, similar comments about her on prior occasions and that he previously had made sexually-charged, derogatory comments about another female CSX employee. Ms. Smith asserts that evidence of sexual harassment of another employee demonstrates the pervasiveness of the misconduct in the workplace. *See* W. Va. C.S.R. § 77–4–2.4.5 (1992) (indicating that severity or pervasiveness of sexual harassment may be proven where "[a] person who has been harassed on an isolated basis ... offer[s] evidence of harassment suffered by other employees").

Similarly, Ms. Smith, who attributes the threatening telephone calls and visit to her house to Mr. Knick, contends that the hostility she experienced after her report of Mr. Knick's misconduct and his demotion constituted sexual harassment. *Citing* W. Va. C.S.R. § 77–4–2.5 ("Hostile or physically aggressive behavior may also constitute sexual harassment, as long as the disparate treatment is based on gender."). Moreover, Ms. Smith represents that CSX failed to take corrective action to definitively identify the perpetrator of these acts insofar as she reported these incidents to both her superiors and the railroad police, but no one ever questioned Mr. Knick as to his involvement therein.

Finally, Ms. Smith argues that Mr. Knick's actions were so severe and pervasive that, upon demoting him for his misconduct, Ms. Smith's supervisors immediately directed her to leave work and placed her on paid administrative leave out of an apparent concern for her safety and corresponding fear of what actions, if any, Mr. Knick might take against Ms. Smith in retaliation for his demotion. Given that Mr. Knick's transfer to a new position required Ms. Smith to be his direct supervisor and that CSX permitted Mr. Knick to transfer to such a position, while correspondingly refusing to place Ms. Smith in a comparable position in which she would not be required to serve as Mr. Knick's direct supervisor, Ms. Smith claims that CSX promoted the continuance of her hostile working environment. *Citing P. v. Delta Air Lines, Inc.,* 102 F.Supp.2d, 132, 138–39

(E.D.N.Y.2000) (concluding that hostile work environment may occur where employee victim of sexual harassment "is subsequently forced to work alongside" the harasser), *vacated by Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128 (2d Cir.2001).

Our consideration of this assignment of error is guided by our prior holding dictating when evidence is sufficient to support a jury verdict in a particular case:

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983). Furthermore, "[w]hen a case involving conflicting testimony and circumstances has been fairly tried, under proper instructions, the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it." Syl. pt. 4, *Laslo v. Griffith,* 143 W.Va. 469, 102 S.E.2d 894 (1958).

With respect to the law determinative of the merits of this assignment of error, we have held that,

> [t]o establish a claim for sexual harassment under the West Virginia Human Rights Act, W. Va.Code, 5–11–1 *et seq.,* based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

Syl. pt. 5, *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995). Moreover,

> [a]n employee may state a claim for hostile environment sexual harassment if

unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment.

Syl. pt. 7, *Hanlon,* 195 W.Va. 99, 464 S.E.2d 741. *Accord* Syl. pt. 2, *Cutright v. Metropolitan Life Ins. Co.,* 201 W.Va. 50, 491 S.E.2d 308 (1997) ("When a workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994), is violated."). With specific regard for the managerial level position in which Ms. Smith was employed at the time Mr. Knick made his derogatory comments about her, it also should be noted that

[a] supervisory employee can state a claim for relief against an employer on the basis of a hostile work environment created by one or more subordinate employees if the employer knew or should have known about the offending conduct, yet failed to take swift and effective measures reasonably calculated to end the harassment.

Syl. pt. 9, *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741. Finally,

[o]nce a plaintiff in a sexual harassment case introduces evidence that demonstrates the four elements set forth in syllabus point five of *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995), he/she has proven a *prima facie* case of sexual harassment, which must then be presented to the jury.

Syl. pt. 5, *Akers v. Cabell Huntington Hosp., Inc.,* 215 W.Va. 346, 599 S.E.2d 769 (2004).

■ Applying these factors to the case *sub judice* we conclude that the circuit court did not err by upholding the jury's findings of a hostile workplace based upon sexual harassment. The parties do not dispute that the evidence presented at trial satisfies the first two *Hanlon* factors: "(1) the subject conduct was unwelcome" and "(2) it was based on the sex of the plaintiff." Syl. pt. 5, in part, *Hanlon,* 195 W.Va. 99, 464 S.E.2d 741. A review of the record before us indicates that Ms. Smith's evidence at trial also demonstrated the existence of the third element: that the sexual harassment "was sufficiently severe or pervasive to alter [her] conditions of employment and create an abusive work environment." Syl. pt. 5, in part, *id.*

To establish severity and pervasiveness, Ms. Smith demonstrated that Mr. Knick's derogatory comment and the ramifications from her reporting thereof resulted in her supervisors directing her to immediately leave her workplace because they feared reprisal from Mr. Knick's demotion and advising her to take a paid administrative leave. The fallout from this incident additionally required Ms. Smith to obtain psychiatric counseling and treatment and to take an extended medical leave of absence. Finally, when Ms. Smith expressed to her supervisors her discomfort, trepidation, and outright fear at the prospect of having to serve as Mr. Knick's supervisor following his demotion and transfer to a locomotive engineer position within her supervisory territory, CSX's failure and refusal to accommodate her concerns forced Ms. Smith to resign her managerial position, transfer into a lower ranking job, accept a significant pay reduction, and relocate her residence simply to escape the hostile working environment created by Mr. Knick and perpetuated by CSX. The cumulative effect of Mr. Knick's misconduct, which CSX compounded by its inaction, provided sufficient facts from which the jury could conclude that the sexual harassment endured by Ms. Smith was both severe and pervasive.

■ We previously have recognized that "[i]f the plaintiff proves that [her fellow employee] created in her a reasonable fear of physical retaliation or a fear for her own safety, she proves an abuse" to establish a hostile working environment. *Hanlon,* 195 W.Va. at 110, 464 S.E.2d at 752. It goes without saying that Ms. Smith was afraid of Mr. Knick as is apparent from her relocation to a different CSX territory to avoid supervising him. Ms. Smith's supervisors also were apprehensive about Mr. Knick insofar as they advised her to immediately leave her

office and placed her on paid administrative leave. Thus, Ms. Smith proved her claim of a hostile workplace. Similarly, "[i]f the plaintiff proves employer insensitivity or unconcern, she proves an abuse" to establish a hostile working environment. *Id.* To the extent that Ms. Smith was required to accept a demotion in job title and a consequent reduction in pay, as well as a transfer to a different CSX territory, because CSX retained Mr. Knick as an employee and would not accommodate Ms. Smith's concerns about being Mr. Knick's supervisor, Ms. Smith again has provided sufficient facts from which a jury could find her working environment was hostile based upon sexual harassment.

▇▇ Finally, the fourth *Hanlon* factor requires a finding that the hostile work environment "was imputable on some factual basis to the employer." Syl. pt. 5, in part, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741. As previously noted, CSX continued to employ Mr. Knick in spite of his misconduct towards Ms. Smith and other female CSX employees; demoted Mr. Knick but allowed him to transfer to a position within Ms. Smith's supervisory territory; and refused to accommodate Ms. Smith's concerns about being Mr. Knick's supervisor to permit her to retain her managerial position. Instead, Ms. Smith endured a demotion, pay reduction, and residential relocation simply to avoid further victimization as the supervisor of the employee who had sexually harassed her. It is quite apparent, based upon these facts, that Ms. Smith's hostile workplace most definitely was "imputable ... to [her] employer." *Id.*

The evidence Ms. Smith presented at trial demonstrated that Mr. Knick's misconduct and CSX's failure to remedy the ramifications thereof created such "an intimidating, hostile, [and] offensive working environment," Syl. pt. 7, in part, *Hanlon*, 195 W.Va. 99, 464 S.E.2d 741, that Ms. Smith had to extricate herself therefrom by moving halfway across the State of West Virginia to avoid her harasser. As such, the circuit court properly determined that, because Ms. Smith established the four *Hanlon* factors to "prov[e] a *prima facie* case of sexual harassment," Syl. pt. 5, in part, *Akers*, 215 W.Va.

346, 599 S.E.2d 769, Ms. Smith's claim of a hostile work environment based upon sexual harassment should be presented to, and decided by, the jury for its final decision upon the facts. Accordingly, we affirm the circuit court's ruling in this regard.

### B. Jury Instructions

Next, CSX assigns error to the jury instructions given by the circuit court. First, CSX contends that Plaintiff's Instruction Number 7 improperly lowered the burden of proof by which Ms. Smith must demonstrate that the reasons CSX gave for her discharge were pretextual. Second, CSX alleges that Plaintiff's Instruction Number 26 improperly required it to prove that Ms. Smith would have been discharged even in the absence of an unlawful motive.

▇▇ Guiding our consideration of both of these issues is our well-established jurisprudence regarding a trial court's initial formulation of jury instructions and this Court's ultimate review of such charge. As we previously have explained,

> [t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.

Syl. pt. 6, *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995). Moreover,

> [a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the spe-

cific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. pt. 4, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Thus, " '[i]t will be presumed that a trial court acted correctly in giving ... instructions to the jury, unless it appears from the record in the case that the instructions were prejudicially erroneous[.]' Syllabus Point 1, [in part,] *State v. Turner*, 137 W.Va. 122, 70 S.E.2d 249 (1952)." Syl. pt. 1, in part, *Moran v. Atha Trucking, Inc.*, 208 W.Va. 379, 540 S.E.2d 903 (1997). Finally, although the wording of individual instructions is within a trial court's discretion, this Court's overall inquiry as to whether the jury was instructed appropriately is plenary: "[T]he question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. pt. 1, in part, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996). In consideration of these standards, we will address separately each of CSX's instructional assignments of error.

**1. Plaintiff's Instruction Number 7.** CSX first challenges Plaintiff's Instruction Number 7, which the circuit court gave over CSX's objection. Plaintiff's Instruction Number 7 directed:

This Court instructs the jury that proof of pretext can by itself sustain a conclusion that the defendant engaged in retaliation. "Pretext" means a false reason or motive advanced to hide the actual reason or motive. Therefore, if the jury disbelieves the defendant's [CSX's] explanation for its termination of the Plaintiff [Ms. Smith], the jury may conclude that the logical explanation for the action was the plaintiff's complaints of harassment or her filing of a lawsuit.

In its motion for post-trial relief, CSX alleged that this instruction was erroneous because (1) it did not specifically state that Ms. Smith must prove pretext by a preponderance of the evidence and (2) it did not state that Ms. Smith was required to show that CSX's stated reasons for the discharge were pretextual. The circuit court rejected both of these arguments in denying CSX's motion. First, the circuit court explained that not

every single instruction must contain "preponderance of the evidence" language. Rather, the instructions, as a whole, made it clear to the jury that Ms. Smith must prove her claims by a preponderance of the evidence. Thus, the court refused CSX's request to read the challenged instruction in isolation without regard for the remainder of the charge. Second, the circuit court, relying upon this Court's decision in *Barefoot v. Sundale Nursing Home*, explained that Ms. Smith was not required to prove that CSX's reasons were pretextual, but must prove only that a prohibited factor was at least one of the "motivating" reasons: "the plaintiff is not required to show that the defendant's proffered reasons were false or played no role in the termination, but only that they were not the only reasons and the prohibited factor was at least one of the 'motivating' reasons." 193 W.Va. 475, 487 n. 18, 457 S.E.2d 152, 164 n. 18 (1995) (citation omitted).

Before this Court, CSX argues that Plaintiff's Instruction Number 7 did not require Ms. Smith to *prove*, by a preponderance of the evidence, that CSX's explanation for her termination was pretextual, and, therefore, that the instruction improperly allowed the jury to *infer* that CSX's stated reason was merely a pretext for retaliation against Ms. Smith. CSX concedes that the jury presumably found that Ms. Smith had established a *prima facie* retaliatory discharge claim, and, in fact, CSX responded thereto at trial by introducing evidence to show that it terminated Ms. Smith for improper personal use of taxis. Because CSX presented "credible evidence of legitimate nondiscriminatory reasons for its actions," *Mace v. Pizza Hut, Inc.*, 180 W.Va. 469, 472, 377 S.E.2d 461, 464 (1988), CSX contends that the burden then should have shifted back to Ms. Smith to "prove by a preponderance of the evidence that the reasons offered by the employer for discharge were merely a pretext." *West Virginia Dep't of Natural Res. v. Myers*, 191 W.Va. 72, 76, 443 S.E.2d 229, 233 (1994).

Ms. Smith rejects CSX's argument regarding Plaintiff's Instruction Number 7 as lacking merit because other instructions made it clear that Ms. Smith had to prove her claims by a preponderance of the evidence. Specifi-

cally, Ms. Smith asserts that the very language that CSX argues should have been included in Plaintiff's Instruction Number 7 was given to the jury in Defendant's Instruction Number 12. Defendant's Instruction Number 12, which was given over Ms. Smith's objection, instructed the jury as follows:

> In assessing Plaintiff's [Ms. Smith's] claim for retaliatory discharge, you must consider any legitimate, nondiscriminatory reason or explanation stated by Defendant [CSX] for its decision to terminate Plaintiff. If you determine that Defendant has stated such a reason, then you must decide in favor of Defendant unless Plaintiff also proves by a preponderance of the evidence that the stated reason was not the true reason, but was only a pretext or excuse for Defendant's retaliation against Plaintiff because of her sexual harassment complaint.

Thus, this instruction required the jury to decide in favor of CSX *unless* Ms. Smith proved by a preponderance of the evidence that CSX's stated reason for the termination was not the true reason, but was merely a pretext or excuse for CSX's retaliation against Ms. Smith. Additionally, Ms. Smith relies on our decision in *Barefoot* as support for her position that she was not required to prove that CSX's given reason for her termination was false, but only that retaliation against her was one of the "motivating" reasons for CSX's decision to fire her. *See Barefoot*, 193 W.Va. at 487 n. 18, 457 S.E.2d at 164 n. 18.

A review of Plaintiff's Instruction Number 7 suggests that the challenged language was taken from Syllabus point 5 of *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996), which directs, in relevant part, that, "[i]n disparate treatment cases ..., proof of pretext can by itself sustain a conclusion that the defendant engaged in unlawful discrimination." This instruction also is consistent with our decision in *Barefoot*, which holds that "[a] finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and, thus, permits the ultimate inference of discrimination." Syl. pt. 5, 193

W.Va. 475, 457 S.E.2d 152. Nevertheless, CSX argues that because *Skaggs* was a disability discrimination case based on a disparate treatment theory, it should not apply to Ms. Smith's retaliatory discharge claim. However, we have applied the *Skaggs* standard of proof to pretext claims, as well. *See Page v. Columbia Natural Res., Inc.*, 198 W.Va. 378, 391, 480 S.E.2d 817, 830 (1996) ("We likewise adopt the *Skaggs* scheme of proof for pursuing a pretext theory."). Therefore, Plaintiff's Instruction Number 7 is "a correct statement of the law" regarding the pretext theory of Ms. Smith's retaliatory discharge claim. *See* Syl. pt. 4, in part, *Guthrie*, 194 W.Va. 657, 461 S.E.2d 163.

We further reject CSX's invitation to examine Plaintiff's Instruction Number 7 outside the context of the entirety of the jury charge. The other instructions made it abundantly clear that Ms. Smith had to prove by a preponderance of the evidence that CSX's provided reason for Ms. Smith's termination was pretextual. In fact, the very language that CSX claims should have been included in Plaintiff's Instruction Number 7 was included in Defendant's Instruction Number 12. In pertinent part, Defendant's Instruction Number 12 required that if the jury

> determine[s] that Defendant [CSX] has stated ... a [legitimate non-discriminatory] reason [for terminating Plaintiff [Ms. Smith]], then [the jury] must decide in favor of Defendant *unless Plaintiff also proves by a preponderance of the evidence that the stated reason was not the true reason, but was only a pretext or excuse for Defendant's retaliation against Plaintiff* because of her sexual harassment complaint.

(Emphasis added). Thus, "the instructions given as a whole [were] accurate and fair to both parties." Syl. pt. 6, in part, *Tennant*, 194 W.Va. 97, 459 S.E.2d 374. Accordingly, we conclude that the circuit court did not err by giving Plaintiff's Instruction Number 7, and, thus, we affirm the circuit court's ruling in this regard.

**2. Plaintiff's Instruction Number 26.** CSX also challenges Plaintiff's Instruction Number 26, which the circuit court gave

over CSX's objection. Plaintiff's Instruction Number 26 directed:

[1] If the plaintiff [Ms. Smith] proves, by a preponderance of the evidence, that she was terminated in retaliation for her complaints of harassment or for filing a lawsuit against the defendant [CSX], you may find in favor of the plaintiff. [2] However, if you find that the plaintiff was terminated for a legitimate, non-discriminatory reason, you may find in favor of the defendant. [3] Finally, if you find that the defendant was motivated by both a retaliatory reason and a non-retaliatory reason in its decision to terminate the plaintiff, then defendant will be able to avoid liability only if it can prove that the same result would have occurred even without the unlawful motive. [4] Nevertheless, the ultimate burden of persuasion remains at all times with the plaintiff to prove that she was terminated in retaliation for engaging in protected conduct.

(Numbers added). In its motion for a new trial, CSX argued that the third sentence of this instruction improperly required it to prove that Ms. Smith would have been terminated even in the absence of a retaliatory motive. In denying the motion for a new trial, the circuit court concluded that this instruction was well-supported by West Virginia law based upon this Court's prior holdings in Syllabus point 6 of *Skaggs*,[17] 198 W.Va. 51, 479 S.E.2d 561, and Syllabus point 8 of *Page*,[18] 198 W.Va. 378, 480 S.E.2d 817.

Before this Court, CSX argues that, because *Skaggs* is a disparate treatment case, the standard of proof adopted therein does not apply to Ms. Smith's retaliatory discharge claim in the case *sub judice*. See

generally *Skaggs*, 198 W.Va. 51, 479 S.E.2d 561. Additionally, CSX contends that the third sentence of Plaintiff's Instruction Number 26 improperly required it to prove that Ms. Smith would have been terminated even in the absence of a retaliatory motive when the burden of proof should have been upon Ms. Smith to prove that her termination was actually in retaliation for her sexual harassment claims. Finally, CSX alleges that Ms. Smith failed to carry her burden of establishing that retaliation was a motivating factor in CSX's decision to terminate her.

In response, Ms. Smith relies upon both *Skaggs*, 198 W.Va. 51, 479 S.E.2d 561, and *Page*, 198 W.Va. 378, 480 S.E.2d 817, to argue that it was proper for Plaintiff's Instruction Number 26 to require that Ms. Smith would have been terminated even in the absence of a retaliatory motive. Furthermore, Ms. Smith maintains that Plaintiff's Instruction Number 26 did not place an unfair burden on CSX because the last sentence of the instruction stated that "the ultimate burden of persuasion remains at all times with [Ms. Smith] to prove that she was terminated in retaliation for engaging in protected conduct." Finally, Ms. Smith contends that she carried her burden of proof and established that retaliation was a motivating factor in CSX's decision to terminate her employment.

Based upon our existing law, we reject each of CSX's objections to Plaintiff's Instruction Number 26. First, CSX alleges that because *Skaggs* was a disparate treatment case, the standard of proof adopted therein should not apply to the instant retaliatory discharge case. *See generally* 198

---

**17.** Syllabus point 6 of *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996), requires a plaintiff to "prove[ ] by a preponderance of the evidence that a forbidden intent was a motivating factor in an adverse employment action." The defendant then will be held liable "unless it proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive." *Id.* For the full text of Syllabus point 6 of *Skaggs*, see Section III.B.2., *infra*.

**18.** Pursuant to Syllabus point 8 of *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996),

[o]nce the plaintiff in an action for wrongful discharge based upon the contravention of a substantial public policy has established the existence of such policy and established by a preponderance of the evidence that an employment discharge was motivated by an unlawful factor contravening that policy, liability will then be imposed on a defendant unless the defendant proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

W.Va. 51, 479 S.E.2d 561. Syllabus point 6 of *Skaggs* holds that,

> [i]n disparate treatment discrimination cases under the West Virginia Human Rights Act, *W. Va.Code*, 5–11–9 (1992), a plaintiff proves a claim for unlawful discrimination if he or she proves by a preponderance of the evidence that a forbidden intent was a motivating factor in an adverse employment action. Liability will then be imposed on a defendant unless it proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

198 W.Va. 51, 479 S.E.2d 561. Nevertheless, as explained in Section III.B.1., *supra*, we made clear in *Page* that the *Skaggs* standard of proof also applies to cases alleging pretext: "[w]e likewise adopt the *Skaggs* scheme of proof for pursuing a pretext theory." 198 W.Va. at 391, 480 S.E.2d at 830. Thus, because *Skaggs* indicates that liability will be imposed unless a defendant can prove that the same result would have occurred even without the unlawful motive, Syl. pt. 6, 198 W.Va. 51, 479 S.E.2d 561, and because *Page* applies the *Skaggs* analysis to pretext theories, 198 W.Va. at 391, 480 S.E.2d at 830, we conclude that Plaintiff's Instruction Number 26 is "a correct statement of the law." Syl. pt. 4, in part, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163.

CSX also complains that the third sentence of Plaintiff's Instruction Number 26, which permitted CSX "to avoid liability only if it can prove that the same result would have occurred even without the unlawful motive," improperly shifted the burden of persuasion from Ms. Smith to CSX. However, the final sentence of this challenged instruction clearly indicated that "the ultimate burden of persuasion remains at all times with [Ms. Smith] to prove that she was terminated in retaliation for engaging in protected conduct." Because the ultimate burden remained at all times with Ms. Smith, the third sentence of Plaintiff's Instruction Number 26 did not shift the burden of proof to CSX, but actually offered CSX another way to avoid liability after Ms. Smith had carried her burden. In *Martin v. Randolph County Board of Education,* we determined that "[i]f the plaintiff

proves by a preponderance of the evidence that an illicit motive entered into the challenged employment decision, then the plaintiff wins unless the defendant proves by a preponderance of the evidence that the same result would have occurred even in the absence of the illicit motive." 195 W.Va. 297, 310–11, 465 S.E.2d 399, 412–13 (1995). Therefore, once Ms. Smith had proven by a preponderance of the evidence that CSX terminated her in retaliation for her claim of sexual harassment, the third sentence of Plaintiff's Instruction Number 26 still would have allowed CSX to avoid liability if it could have proven that it would have terminated Ms. Smith despite her sexual harassment claim.

 Finally, we reject CSX's contention that Ms. Smith failed to carry her burden of proof that retaliation was a motivating factor in CSX's decision to terminate her. During the trial of this case, CSX presented evidence that it terminated Ms. Smith for her improper personal use of CSX taxis. The burden of proof then returned to Ms. Smith to prove, by a preponderance of the evidence, that CSX's stated reason was merely a pretext for its illicit motive of retaliation. *See* Syl. pt. 6, *Skaggs,* 198 W.Va. 51, 479 S.E.2d 561; *Martin,* 195 W.Va. at 310–11, 465 S.E.2d at 412–13. The record evidence demonstrates that Ms. Smith adequately carried her burden by introducing evidence that she was given specific permission, by three different supervisors, to use the CSX taxi service to transport her to and from work; Ms. Smith's supervisors were aware of the numerous threats of violence that she had received since she had reported Mr. Knick's sexually harassing comments; CSX did not have any actual company policies governing its employees' use of its taxi service; personal use of taxis was widespread among CSX employees, including Ms. Smith's supervisors; and no other employee had ever been disciplined, much less terminated, for improper personal use of CSX taxis. In light of this damaging evidence, the jury easily could have found that any explanation offered by CSX to show that it would have terminated Ms. Smith anyway was merely a pretext for its unlawful motive. Thus, the evidence supported the jury's conclusion that Ms. Smith had proven, by a

preponderance of the evidence, that CSX's stated reason for Ms. Smith's termination was pretextual.

In sum, we conclude that the circuit court did not err by giving Plaintiff's Instruction Number 26. This instruction correctly stated the law by placing the burden on Ms. Smith to prove that she was terminated in retaliation for her claim of sexual harassment. Once Ms. Smith carried this burden, the instruction allowed CSX to still avoid liability if it could prove that it would have terminated Ms. Smith for nonretaliatory reasons. *See* Syl. pt. 6, *Skaggs*, 198 W.Va. 51, 479 S.E.2d 561; *Martin*, 195 W.Va. at 310–11, 465 S.E.2d at 412–13. Moreover, from the evidence presented at trial, a jury could have found that retaliation was a motivating factor in CSX's termination decision. Thus, Plaintiff's Instruction Number 26 was not "prejudicially erroneous," Syl. pt. 1, in part, *Moran*, 208 W.Va. 379, 540 S.E.2d 903, and "the instructions given as a whole [were] accurate and fair to both parties," Syl. pt. 6, in part, *Tennant*, 194 W.Va. 97, 459 S.E.2d 374. Therefore, we find no error with Plaintiff's Instruction Number 26, and we affirm the circuit court's rulings in this regard.

### C. Punitive Damages

Finally, CSX assigns error to the circuit court's rulings upholding as proper the jury's award of punitive damages to Ms. Smith. CSX argues both that the evidence does not support an award of punitive damages and, alternatively, even if punitive damages are warranted, the amount of punitive damages awarded by the jury is excessive.

Our review of the propriety of a punitive damages award involves a two-step inquiry:

> When this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895), and its progeny. If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992)[, *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) ].

Syl. pt. 6, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W.Va. 482, 694 S.E.2d 815 (2010). Such a review by this Court is plenary:

> When reviewing an award of punitive damages in accordance with Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991),[19] and Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996),[20] this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.

Syl. pt. 16, *Peters v. Rivers Edge Mining, Inc.*, 224 W.Va. 160, 680 S.E.2d 791 (2009)

---

**19.** Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), provides that,

> [u]pon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

**20.** Pursuant to Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996),

> [u]nder our punitive damages jurisprudence, it is imperative that the amount of the punitive damage award be reviewed in the first instance by the trial court by applying the model specified in Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 15 of *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Thereafter, and upon petition, this Court will review the amount of the punitive damage award, applying the standard specified in Syllabus Point 5 of *Garnes*.

(footnotes added). We will consider separately each of CSX's assigned errors.

**■ 1. Entitlement to punitive damages award.** CSX first argues that the evidence presented at trial does not support an award of punitive damages to Ms. Smith. During its consideration of CSX's motion for post-trial relief, the circuit court determined that Ms. Smith had presented sufficient evidence at trial to support an award of punitive damages. Among the facts supporting its ruling, the circuit court cited CSX's failure to discipline Mr. Knick for his history of sexually harassing comments despite its stated zero-tolerance policy with respect to workplace discrimination; its negligent retention of Mr. Knick; its subjection of Ms. Smith to a hostile work environment; its attacks upon Ms. Smith's character when it accused her of dishonesty and theft; and its eventual retaliatory discharge of Ms. Smith. The circuit court additionally relied upon the jury's verdict finding that CSX did not investigate or adequately respond to Ms. Smith's report of Mr. Knick's harassment.

On appeal to this Court, CSX disputes that the evidence presented at trial warrants an award of punitive damages contending, instead, that there is no record evidence to suggest that it acted with malice or in wilful disregard of Ms. Smith's rights. To this end, CSX argues that the record demonstrates that Ms. Smith waited approximately two weeks before reporting Mr. Knick's derogatory comment to her supervisors, and that once CSX learned of Mr. Knick's misconduct, it immediately met with him and began an investigation of Ms. Smith's charges. CSX states that, within one month of Ms. Smith's report, it concluded its investigation and fired Mr. Knick from his managerial position. Correspondingly, CSX recounts that it permitted Ms. Smith to take a paid administrative leave followed by a lengthy paid medical leave and that it left open her trainmaster position in Grafton during her absences from work. CSX also represents that it offered Ms. Smith the option to transfer to two different managerial-level trainmaster positions, in Kentucky and Tennessee, comparable to the one she held in Grafton, but that she refused those positions, opting instead to re-

turn to her former, non-management level job as a yardmaster in Boone County. Lastly, CSX contends that it acted under a *bona fide* claim of right when it terminated Ms. Smith for her improper taxi use.

By contrast, Ms. Smith argues that the evidence presented at trial was sufficient to permit the jury to award her punitive damages. In this regard, Ms. Smith contends that the jury could have found that CSX acted with malice by unlawfully terminating her based upon her complaints of sexual harassment against Mr. Knick or her filing of a lawsuit against CSX alleging that it had subjected her to a hostile workplace based upon sexual harassment. Given that CSX claimed to have a zero tolerance policy with respect to sexual harassment, Ms. Smith suggests that one would have expected CSX to have terminated Mr. Knick's employment once it had verified that Mr. Knick had sexually harassed both Ms. Smith and other female CSX employees. However, because CSX only demoted Mr. Knick, and permitted him to transfer to a position within Ms. Smith's supervisory territory, the jury could have concluded that CSX had acted maliciously and with wilful disregard for Ms. Smith's rights in retaining Mr. Knick as a CSX employee in spite of his sexually harassing misconduct. Finally, Ms. Smith argues that CSX's decision to terminate her employment based upon her use of the CSX taxi service was pretextual because CSX did not have an established policy governing employees' use of its taxis and Ms. Smith's supervisors had given her express permission to use them. Thus, when all of the evidence is considered in its totality, Ms. Smith claims that the evidence is sufficient to support the jury's conclusion that an award of punitive damages against CSX is proper in this case.

**■** Our first inquiry regarding the propriety of the punitive damages awarded in this case, then, is whether the evidence of CSX's conduct was sufficient to support a punitive damages award. *See* Syl. pt. 6, in part, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W.Va. 482, 694 S.E.2d 815. We previously have held that, *"[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or*

criminal indifference to civil obligations affecting the rights of others appear, or *where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages;* these terms being synonymous." Syl. pt. 4, *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895) (emphasis added). *See also* Syl. pt. 4, *Harless v. First Nat'l Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982) (" 'Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong.' Syllabus Point 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941)."); Syl. pt. 3, *Jopling v. Bluefield Water Works & Improvement Co.,* 70 W.Va. 670, 74 S.E. 943 (1912) ("To sustain a claim for punitive damages, the wrongful act must have been done maliciously, wantonly, mischievously, or with criminal indifference to civil obligations. A wrongful act, done under a *bona fide* claim of right, and without malice in any form, constitutes no basis for such damages."). Thus, when a legislative enactment authorizes punitive damages in a particular case, an award of such damages therein is proper. Syl. pt. 4, in part, *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58. With specific respect to cases, such as this one, that allege discrimination under the West Virginia Human Rights Act, we have held that "[p]unitive damages are an available form of remedial relief that a court may award under the provisions of *W. Va.Code,* 5–11–13(c) [1998]." Syl. pt. 5, *Haynes v. Rhone–Poulenc, Inc.,* 206 W.Va. 18, 521 S.E.2d 331 (1999). Thus, if the evidence establishes that CSX unlawfully discriminated against Ms. Smith in violation of the Human Rights Act, an award of punitive damages is authorized by the governing statutory law.

In the case *sub judice,* Ms. Smith alleges that CSX unlawfully discriminated against her on the basis of her gender and subjected her to a hostile work environment in violation of the West Virginia Human Rights Act. W. Va.Code § 5–11–9(1) (1998) (Repl.Vol. 2006) prohibits employers from discriminating against their employees. More specifi-cally, discrimination based upon sexual harassment occurs when "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." W. Va.C.S.R. §§ 77–4–2.2 & 77–4–2.2.3 (1992). As explained in our consideration of CSX's assignment of error regarding the sufficiency of the evidence to support Ms. Smith's claim that it had subjected her to a hostile work environment based upon sexual harassment, *see* Section III.A., *supra,* the evidence presented at the trial of this case sufficiently supports the jury's verdict that CSX discriminated against Ms. Smith on the basis of her gender. In allowing the creation and persistence of a sexually harassing hostile workplace, CSX failed to adequately respond to Ms. Smith's complaints of sexual harassment by Mr. Knick; refused to accommodate her concerns when Mr. Knick transferred to a position within Ms. Smith's supervisory territory; and eventually constructively discharged Ms. Smith by requiring her to accept a lower ranking and lower paying position so that she could avoid her harasser in the workplace. Based upon these facts, the jury could have concluded that CSX discriminated against Ms. Smith on the basis of her gender in violation of the West Virginia Human Rights Act. Insofar as the Human Rights Act permits an award of punitive damages to an employee who has been unlawfully discriminated against by his/her employer, Syl. pt. 5, *Haynes v. Rhone–Poulenc, Inc.,* 206 W.Va. 18, 521 S.E.2d 331, the jury's award of punitive damages to Ms. Smith was proper in this case. Accordingly, we affirm the circuit court's ruling upholding the jury's verdict awarding punitive damages to Ms. Smith.

**2. Amount of punitive damages award.** Alternatively, CSX argues that, even if the evidence at trial is sufficient to sustain an award of punitive damages to Ms. Smith, the amount of punitive damages awarded by the jury in this case, *i.e.,* $500,000, is excessive. Reviewing the amount of the jury's award of punitive damages to Ms. Smith, the circuit

court concluded that punitive damages of $500,000 were not excessive based upon the evidence presented at trial. In particular, the circuit court found that the evidence demonstrated CSX's reckless disregard of Ms. Smith's right to be free from unlawful discrimination and harassment in the workplace; the substantial psychological harm endured by Ms. Smith as a result of her hostile work environment; the reprehensibility of CSX's actions in terminating Ms. Smith's employment in retaliation for her claim of sexual harassment; and the pretextual reason asserted by CSX to justify Ms. Smith's termination. Exclusive of prejudgment interest, the ratio of punitive damages to compensatory damages in this case is approximately 0.32 to 1, which the circuit court found to be reasonable.

In support of its assignment of error on this ground, CSX argues that the evidence presented at trial did not establish aggravating factors that would serve to increase Ms. Smith's award of punitive damages, but that it did present evidence of mitigating factors that should be considered to reduce such an award. In support of its argument, CSX claims that its actions were not reprehensible and that it did not cause Ms. Smith to endure any physical harm. Additionally, CSX contends that, rather than showing indifference or reckless disregard for Ms. Smith's rights, it acted swiftly and decisively upon receiving Ms. Smith's report of sexual harassment by Mr. Knick, and that it terminated her only after it had concluded that she had used the CSX taxi service improperly and she had been afforded her union hearing rights.

Ms. Smith responds by asserting that a $500,000 punitive damages award is not excessive based upon the evidence presented at trial of CSX's unlawful discriminatory em-ployment actions against her. Based upon such evidence, Ms. Smith contends that the jury reasonably could have found that CSX permitted the creation of a work environment in which she was subjected to intentional and malicious sexual harassment, as a result of which she endured significant psychological distress. Additionally, Ms. Smith suggests that the evidence demonstrated that CSX lied about its reason for firing her to hide its unlawful motive and, in doing so, that CSX disparaged her character by claiming that she had committed theft when she used its taxi service despite having first obtained her supervisors' permission for such use. Finally, Ms. Smith asserts that the ratio of punitive damages to compensatory damages in this case, which is 0.32 to 1, is relatively low considering the severity of CSX's unlawful discriminatory actions and that the punitive damages award bears a reasonable relationship to the compensatory damages awarded by the jury.

 Whether the amount of an award of punitive damages is excessive in a particular case depends upon the aggravating criteria that support an increased punitive damages award; the mitigating criteria in favor of a reduced punitive damages award; and the reasonableness of the resulting ratio of compensatory to punitive damages awarded. *See* Syl. pt. 6, in part, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W.Va. 482, 694 S.E.2d 815. The factors a reviewing court is required to consider in reviewing the amount of a punitive damages award for excessiveness are set forth in Syllabus point 7 of *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W.Va. 482, 694 S.E.2d 815:

> When a trial or appellate court reviews an award of punitive damages for excessiveness under Syllabus points 3 [21] and

---

**21.** Pursuant to Syllabus point 3 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897,

[w]hen the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his ac-

4 [22] of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), the court should first determine whether the amount of the punitive damages award is justified by aggravating evidence including, but not limited to: (1) the reprehensibility of the defendant's conduct; (2) whether the defendant profited from the wrongful conduct; (3) the financial position of the defendant; (4) the appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed; and (5) the cost of litigation to the plaintiff. The court should then consider whether a reduction in the amount of the punitive damages should be permitted due to mitigating evidence including, but not limited to: (1) whether the punitive damages bear a reasonable relationship to the harm that is likely to occur and/or has occurred as a result of the defendant's conduct; (2) whether punitive damages bear a reasonable relationship to compensatory damages; (3) the cost of litigation to the defendant; (4) any criminal sanctions imposed on the defendant for his conduct; (5) any other civil actions against the same defendant based upon the same conduct; (6) relevant information that was not available to the jury because it was unduly prejudicial to the defendant; and (7) additional relevant evidence.

(Footnotes added). In addition to these excessiveness factors, a reviewing court also must consider whether the ratio of punitive to compensatory damages is proper. *See* Syl. pt. 6, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W.Va. 482, 694 S.E.2d 815. The benchmarks for such ratios have been described as follows:

> The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not per se unconstitutional.

Syl. pt. 15, *TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

 From the evidence presented in the case *sub judice*, we conclude that the $500,000 award of punitive damages in this case was not excessive. Among the aggravating factors that justified a larger punitive damages award were the reprehensibility of

---

tions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

22. Syllabus point 4 of *Garnes*, 186 W.Va. 656, 413 S.E.2d 897, instructs that,

[w]hen the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

CSX's conduct in promoting and perpetuating a hostile work environment due to its failure to adequately address Ms. Smith's report of sexual harassment; the psychological distress such an environment caused Ms. Smith; and the measures she, herself, had to take to ameliorate her discriminatory working conditions. Also noteworthy are CSX's actions in this case that evidence its failure to appreciate the hostile workplace to which it subjected Ms. Smith such as CSX's decision to continue to employ Mr. Knick, despite its reported zero tolerance policy and in a position over which Ms. Smith would have been required to supervise his work performance; CSX's refusal to offer an amount in settlement of Ms. Smith's claims; and CSX's continued denials of wrongdoing in this case. *See generally* Syl. pt. 7, in part, *Perrine*, 225 W.Va. 482, 694 S.E.2d 815. We further determine that a reduction in the amount of punitive damages is not warranted by the facts of this case insofar as the punitive damages awarded are reasonably related to the extensive harm sustained by Ms. Smith and proportionate to the compensatory damages awarded by the jury. *Id.*

Finally, neither do we find that the ratio of punitive damages to compensatory damages was disproportionate or otherwise unreasonable based upon the evidence adduced at trial. *See generally* Syl. pt. 15, *TXO*, 187 W.Va. 457, 419 S.E.2d 870. In this case, the jury awarded Ms. Smith $1,277,600 in compensatory damages, which amount does not include prejudgment interest, and $500,000 in punitive damages; the resulting ratio of punitive to compensatory damages is 0.32 to 1. Based upon our approval of a punitive to compensatory damages ratio of 1.13 to 1 in a similar employment discrimination and retaliatory discharge matter, we cannot say that the 0.32 to 1 ratio at issue in the case *sub judice* is excessive, unreasonable, or disproportionate. *See generally Peters v. Rivers Edge Mining, Inc.*, 224 W.Va. 160, 680 S.E.2d 791. Accordingly, we affirm the circuit court's ruling upholding the amount of punitive damages awarded by the jury in this case.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the November 19, 2011, order of the Boone County Circuit Court.

Affirmed.

Chief Justice KETCHUM dissents and reserves the right to file a dissenting opinion.

KETCHUM, C.J., dissenting:

I strongly disagree with the majority opinion. In hostile work environment sexual harassment cases, occasional vulgar banter "does not rise to the level of actionability until after there has been a *significant accumulation of incidents.*" *Hanlon v. Chambers*, 195 W.Va. 99, 112, 464 S.E.2d 741, 754 (1995). (Emphasis added).

The plaintiff's hostile *work* environment claim consisted of one boorish comment that she overheard during a telephone call. This single comment falls far short of the "significant accumulation" of offensive workplace conduct that Justice Cleckley discussed in *Hanlon*. Aside from the single comment made over the telephone, the remaining incidents the plaintiff relied upon to support her hostile *work* environment claim occurred outside of the workplace. These incidents should not have been considered because doing so places an unfair and unmanageable duty on an employer to monitor its employees outside of the workplace. Because the plaintiff could not sustain a *prima facie* hostile work environment claim and because the defendant was prejudiced by an erroneous jury instruction, I respectfully dissent.

### A. A Single Comment Is Not Sufficient to Create an Abusive Work Environment

To establish a hostile work environment sexual harassment claim, a plaintiff must prove that: (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer. *See* Syllabus Point 5, *Hanlon, supra.*

CSX was entitled to entry of judgment on the hostile work environment claim because the single comment the plaintiff overheard at work was not so severe or pervasive that it created an abusive work environment. As a general rule "more than a few isolated incidents are required" to sustain a hostile work environment claim. *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir.1997). The United States Supreme Court has stated that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment ... These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citation omitted). Conduct that is merely offensive is not actionable. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Instead, the workplace must be permeated with "discriminatory intimidation, ridicule and insult" that are sufficiently severe or pervasive to alter the conditions of employment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).[1]

In *Baskerville v. Culligan Intern., Co.*, 50 F.3d 428, 430–31 (7th Cir.1995), Judge Posner discussed the factual line between vulgarity and harassment. He stated that sexual harassment claims are:

> [N]ot designed to purge the workplace of vulgarity. Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures (citations omitted) ... On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S.Ct. 367.

In the case *sub judice*, the plaintiff was working in Grafton, West Virginia, when she overheard an inappropriate comment during a telephone call with Clay Newsome, a CSX employee located in Clifton Forge, Virginia. The comment was made by another CSX employee in Clifton Forge, Virginia, Wes Knick. This comment was not directed at the plaintiff, it was made to Newsome who had his speakerphone on during the telephone conversation. *Harris, Faragher*, and *Meritor* establish that a single comment is generally not sufficient to establish a hostile work environment claim. Knick's single comment was a "mere offensive utterance" and does not come close to satisfying the severe/pervasive element this Court set forth in *Hanlon*.

## B. Alleged Non–Workplace Harassment

The circuit court erred by finding that two non-workplace incidents, coupled with the single derogatory comment, were sufficient to establish a *prima facie* hostile work environment claim. The plaintiff testified that she received harassing phone calls at home and that someone came to her house, knocked on her door, and aggressively shouted for her to come outside. The plaintiff could not identify the person responsible for these non-workplace incidents. Assuming, *arguendo*, that Wes Knick made the phone calls and knocked on the plaintiff's front door, these acts should not have been imputed to CSX because this Court has never held that an employer is liable for its employees' actions that occur outside of the workplace, that are beyond the employees' scope of employment. Requiring employers to monitor its employees outside of the workplace would create an Orwellian nightmare: employers would be tasked with the unmanageable burden of constantly monitoring its employees,

---

1. The Supreme Court has stated that "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing are not sufficient." (citations omitted). *Faragher, supra*, 524 U.S. at 788, 118 S.Ct. 2275.

while employees' private lives would be subject to constant invasion and heightened scrutiny.

A number of courts considering this issue have concluded that employers are not liable for its employees' actions outside of the workplace. For instance, in *Duggins v. Steak'N Shake, Inc.*, 3 Fed.Appx. 302, 311 (6th Cir.2001), the court considered whether an employer in a hostile work environment sexual harassment claim could be held liable for a restaurant employee allegedly raping a co-worker at a private party that occurred outside of the workplace. The court stated:

> Although the Sixth Circuit has not addressed this issue, other courts have held that generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from the workplace setting. *See, Candelore v. Clark County Sanitation District*, 975 F.2d 588, 590 (9th Cir.1992). *See also, McGuinn–Rowe v. Foster's Daily Democrat*, 1997 WL 669965 (D.N.H. July 10, 1997) (unpublished decision), *Temparali v. Rubin*, 1997 WL 361019 (E.D.Pa. June 20, 1997) (unpublished decision). However, when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the work environment to be hostile. *See, e.g., Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991).

Similarly, the Tenth Circuit held that offensive comments made by a supervisor to a co-worker at a wedding reception were not actionable because the conduct occurred outside of the workplace. *See, Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir.1997). The Fifth Circuit considered this issue in *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 510–11 (5th Cir. 2003), and concluded that "a harassment claim, to be cognizable, must affect a person's working environment." The court in *Gowesky* excluded comments a supervisor made over the phone because the plaintiff was not in the workplace when these comments were made.

A recent law journal article supports the view that courts should "exclude evidence of non-workplace conduct when evaluating hostile environment claims." Alisha A. Patterson, "None of Your Business: Barring Evidence of Non–Workplace Harassment for Title VII Hostile Environment Claims," 10 U.C. Davis Bus. L.J. 237, 257 (2010). After considering a number of different approaches courts have used when dealing with non-workplace harassment, the author offers the following conclusion:

> The plain language of Title VII's antidiscrimination protection is clear: Title VII only protects workers from workplace discrimination. In addition, admitting evidence of non-workplace conduct … conflicts with the agency principals governing Title VII. Moreover, a narrow interpretation of Title VII will discourage employers from implementing invasive, self-serving antiharassment policies.[2] The Supreme Court should grant certiorari and adopt the Sixth Circuit's narrow interpretation of Title VII. It should reaffirm that Title VII's protection against workplace discrimination means what it says—protection from discrimination at work.

*Id.* at 268.

In the present case, CSX conducted an immediate investigation after the plaintiff reported the derogatory comment. After interviewing all of the parties involved in the incident, CSX fired Knick, a 27–year employee of the company, from his management position, and allowed him to return to his

---

**2.** The author argues that in order to avoid liability in hostile work environment cases, some employers unnecessarily take:

> [I]ntrusive measures to regulate their employees' private lives. For instance, many employers prohibit fraternization or require employees to sign love contracts before dating. Faced with an allegation of harassment, some employers punish, demote, or fire the alleged harasser, rather than investigate the allegation.

> One employer fired an employee for discussing a racy episode of Seinfeld with his coworker. As a policy matter, courts should not adopt an interpretation of Title VII that exacerbates this trend. Imposing greater liability will encourage employers to use aggressive tactics to shield themselves from litigation at their employees' expense.

*Id.* at 266.

non-management union position. This demotion resulted in a significant reduction in Knick's salary and benefits. CSX took swift remedial action to punish a longtime employee for a single comment he made in the workplace. This was a sufficient response. CSX had no control and no obligation to monitor Knick outside of the workplace.

Based on all of the foregoing, I believe it was error for the trial court to allow the plaintiff to support her hostile work environment claim with alleged incidents that occurred outside of the workplace.

### C. Erroneous Jury Instruction

The trial court gave an erroneous jury instruction that substantially lowered the plaintiff's burden of proof on her retaliatory discharge claim.[3] In Syllabus Point 6 of *Conrad v. ARA Szabo,* 198 W.Va. 362, 480 S.E.2d 801 (1996), this Court explained what a plaintiff must prove in a retaliatory discharge claim:

> In an action to redress an unlawful retaliatory discharge under the West Virginia Human Rights Act, W.Va.Code, 5-1-1, *et. seq.,* as amended, the burden is upon the complainant to prove by a preponderance of the evidence (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation), (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation. (Citations omitted).

The plaintiff has the burden of establishing a *prima facie* case of retaliatory discharge. Justice Cleckley described the burden shifting scheme that applies once a plaintiff has established a *prima facie* case:

> [T]he employer must then come forward with reasons justifying a finding that unlawful discrimination was not the cause of

the employment action. If the employer succeeds, the presumption of discrimination raised by the plaintiff's prima facie case showing "drops out of the picture." (citation omitted). Although the plaintiff has the ultimate burden of persuasion to demonstrate that the challenged employment discrimination was the result of illegal conduct by the employer, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision. The plaintiff is only required to show that the reasons were not the only factors and that the prohibited factor was at least one of the motivating factors.

*Hanlon,* 195 W.Va. at 106, n. 3, 464 S.E.2d at 748, n. 3.

In the case *sub judice,* the trial court gave the plaintiff's instruction number seven over the defendant's objection. The instruction stated:

> The Court instructs the jury that proof of pretext can by itself sustain a conclusion that the defendant engaged in retaliation. Pretext means a false reason or motive advanced to hide the actual reason or motive. Therefore, if the jury disbelieves the defendant's explanation for its termination of the plaintiff, the jury may conclude that the logical explanation for the action was the plaintiff's complaints of harassment or her filing of a lawsuit.

The last sentence is an incorrect statement of law because it shifts the burden of proof to the defendant. This sentence instructs the jury that if it does not believe the employer's proffered reason for the termination, it can infer that the defendant engaged in retaliation. This leaves the mistaken impression that the defendant, not the plaintiff, has the burden of proof on this issue. The instruction Justice Cleckley set forth in *Hanlon* makes it clear that "the plaintiff has the ultimate burden of persuasion to demonstrate that the challenged employment dis-

---

**3.** This Court has previously held that "[i]t is always the duty of the trial court to instruct the jury on all correct principles of law. Instructing a jury on a correct statement of the law applicable to the case is essential to a fair trial." Syllabus Point 1, *Goodwin v. Hale,* 198 W.Va. 554,

482 S.E.2d 171 (1996). "When a jury verdict is premised upon an erroneous conclusion of law by the trial court, as stated in the judge's charge to the jury, it must be set aside." Syllabus Point 5, *State v. Morgan Stanley & Co., Inc.,* 194 W.Va. 163, 459 S.E.2d 906 (1995).

crimination was the result of illegal conduct by the employer." Because this instruction shifts the burden away from the plaintiff, CSX is entitled to a new trial on the retaliatory discharge claim.

Therefore, for the reasons stated above, I dissent.